Mendel Levitz et al. * v. Commissioner. Levitz v. Commissioner
Docket No. 33741. *
United States Tax Court
1952 Tax Ct. Memo LEXIS 97; 11 T.C.M. (CCH) 915; T.C.M. (RIA) 52268; August 29, 1952
*97 1. Held, respondent's determination that additions to partnership's reserve for bad debts were unreasonable, not shown to be an abuse of respondent's discretion. 2. Held, advances by taxpayer to his brother were loans and nonbusiness bad debt deduction allowed in the year the brother died insolvent. 3. Held, the taxpayer's interest in real property deeded to his wife, who died interestate, was limited to a one-third interest under the laws of descent and the basis for determining gain or loss on subsequent sale is the fair market value of the property at the date of the wife's death. Eugene J. Steiner, Esq., 90 State St., Albany, N. Y., for the petitioners. John J. O'Toole, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined deficiencies *98 in income taxes against the petitioners as follows: Docket
Petitioner
No.
Year
Deficiency
Mendel Levitz
33741
1945
$ 1,059.49
1946
10,470.99
Emanuel H. Bocian
33804
1945
340.75
1946
744.50
Estate of Charles D.
Levitz, Deceased, Esther
F. Levitz, Administra-
trix
33805
1945
340.77
1946
728.25
The first issue presented in these consolidated proceedings is whether the additions to the reserve for bad debts of the M. Levitz and Co. in 1945 and 1946 are reasonable. The other issues, pertaining only to the petitioner Mendel Levitz, are whether the petitioner is entitled to a deduction for a bad debt in 1946 and whether petitioner sustained a loss in 1946 on the sale of the real property. Findings of Fact The facts stipulated are so found. Petitioners Mendel Levitz, Emanuel H. Bocian, and the decedent Charles D. Levitz were members of the partnership M. Levitz and Co. in 1945 and 1946. The firm was engaged in the wholesale jewelry, silverware and applicance business. It had been in business since 1922. M. Levitz and Co., hereinafter sometimes referred to as the partnership, operated upon the accrual basis. During 1945 *99 the partnership obtained permission from the respondent to change from the charge-off basis of reporting bad debts to the reserve method. The partnership computed its bad debt reserve for the years 1945 and 1946 upon a basis of one per cent of its charge sales. The firm credited this reserve in the amount of $3,012.67 in 1945 and $5,382.46 in 1946, and deducted these amounts as an expense in those years. The partnership maintained running, or continuous, accounts with many of its customers. The balance of accounts receivable on the books of the partnership as of the end of each of the following years was: December 31, 1940
$234,945.32
December 31, 1941
155,149.61
December 31, 1942
82,095.82
December 31, 1943
74,472.47
December 31, 1944
70,670.26
December 31, 1945
93,558.33
December 31, 1946
177,264.97
December 31, 1947
161,113.23
December 31, 1948
183,726.86 Charge sales for the same years were as follows: 1940
$221,574.95
1941
312,767.44
1942
308,530.11
1943
306,438.51
1944
299,174.59
1945
301,277.56
1946
557,867.08
1947
445,961.17
1948
466,798.91
During 1945 and 1946 the partnership made charge sales in the following *100 amounts, which were not paid in the years during which the sales were made: 1945
Albren, Inc.
$4,926.11
E. McCarthy
212.30
S. Levitz
118,97
M. H. Kraft
94.93
$5,352.31
1946
Albren, Inc.
$5,073.89
Stephens Jewelers
400.26
$5,474.15
In 1948 the firm charged off as a bad debt the sum of $10,000 owing to it from Albren, Inc. In 1949 the partnership charged off $15,284.56 as a bad debt from the same corporation. Albren, Inc. was dissolved in December 29, 1949. The wholesale jewelry, silverware and applicances business was highly competitive. The partnership operated over an area from the Canadian border to North Carolina, including the cities of Baltimore, Philadelphia, and Washington, competing with wholesale concerns of greater size. The firm endeavored to meet competition by pursuing a liberal credit policy. The business relations between the partnership and Albren, Inc. commenced in the 1920s. The latter firm had stores in Brooklyn, New York; Perth Amboy, New Jersey; Stamford, Connecticut, and New Britain, Connecticut. In the early 1930s Albren, Inc. pledged its stock to the partnership as security for an extension of time to pay the debt *101 owing to the partnership and for further credit. The partnership later acquired all the outstanding stock of Albren, Inc. Three of the four stores of Albren, Inc. were liquidated in the 1930s and 1940s. Credit was extended to the New Britain store after 1945 to build up the store to a point where it could be sold profitably. The firm sold to Albren, Inc. at the same prices as to other customers. Albren, Inc. was never clear of debt but it was always able to pay on its running account. Credit was extended to it by the partnership until it was dissolved. At times Albren, Inc. owed the partnership more than $40,000. When Albren, Inc. was dissolved the petitioners received a note for $10,000, which has not been paid, as yet. They were also relieved from a year's rental obligation at $625 per month. Petitioner Mendel Levitz advanced $591 to his brother Sam Levitz during 1944 and 1945. Sam Levitz died insolvent in 1946 and Mendel Levitz did not recover any part of the advances. The advances were loaned by petitioner, who expected repayment. No evidence of indebtedness was given by Sam Levitz to his brother. Prior to 1931, Joseph and Lena Sudofsky owned the premises at 115 South Pearl *102 Street, Albany, New York, which was mortgaged by them as follows: First mortgage to Albany Savings Bank. Second mortgage to Adolf Stern. Third mortgage to petitioner Mendel Levitz. By a deed dated July 24, 1931, the aforementioned premises were conveyed to Lottie Levitz, wife of petitioner Mendel Levitz, by Joseph and Lena Sudofsky. In 1932 Mendel Levitz as mortgagee and Joseph and Lena Sudofsky as mortgagors, settled the debt owing to the petitioner by means of a release. In 1931 petitioner paid the following amounts to protect his equity in the premises at 115 Pearl Street: Interest on Mortgages
$1,560.00
Real Property Taxes
1,512.87
Legal Fee
100.00
$3,172.87
On July 1, 1931, Belle Stern, individually and as Executrix of the Last Will and Testament of Adolph Stern, assigned to petitioners for $5,000 a mortgage on the Pearl Street premises. The unpaid balance on the date of the assignment was $12,000. Mendel Levitz was guarantor of a bond dated March 25, 1932, given in connection with a first mortgage held by the Albany Savings Bank. Lottie Levitz died intestate as a resident of the State of New York, on March 9, 1937, survived by her husband, Mendel *103 Levitz, two daughters, Esther Bocian and Bessie Kraft, and a son, Charles D. Levitz. The appraised fair market value of 115 South Pearl Street on March 9, 1937, was $12,000. On April 29, 1946, the Pearl Street premises were sold to Steve G. and Greta Diamantis for the sum of $16,385. Esther Bocian, Bessie Kraft, and Charles Levitz joined in the deed of sale. None of these persons received consideration for joining in the deed. In 1943 Mendel Levitz liquidated certain mortgages held by the Albany Savings Bank and took assignment of them for $15,750. The respondent partially disallowed the partnership's addition to the reserve for bad debts taken in the years 1945 and 1946, and determined that a proper basis for such additions would be.0036 of the charge sales. This partial disallowance was based on a previous experience ratio of actual bad debts written off (less recoveries) to charge sales for the period 1941 to 1944, inclusive. The respondent also disallowed the deduction taken by petitioner Mendel Levitz for a bad debt of his brother, and the deduction for a loss on the sale of real property in 1946. Opinion VAN FOSSAN, Judge: The initial question is whether the deductions *104 taken in 1945 and 1946 by the partnership were reasonable additions to its reserve for bad debts. [1] The partnership credited its reserve in the amounts of $3,012.67 in 1945 and $5,382.46 in 1946, approximately one per cent of its charge sales in those years. The respondent disallowed those additions to the reserve and determined that.0036 of the charge sales was a proper and reasonable addition. The partnership was engaged in the competitive business of wholesaling jewelry, silverware and appliances. Its sales area extended from Canada to North Carolina, including several large cities on the eastern seaboard. The firm offered liberal credit as a means of meeting competition. It changed from the charge-off method of deduction of bad debts to the reserve method in 1945. The respondent's determination that the additions to the reserve were unreasonable, obliged the *105 petitioners to demonstrate that such a determination was arbitrary and an abuse of the discretion granted to the respondent under the statute. . If the respondent's determination is justified, we cannot overrule his discretion. . The determination of what is a reasonable addition to the reserve depends upon the nature of the business, general business conditions, past experience in collecting accounts and bad debts, the amount of the existing reserve and all other material factors. . In creating the reserve in 1945 and making an addition to it in 1946, the partnership used one per cent of its charge sales as a basis. No evidence to support this percentage was introduced other than the testimony of one petitioner that past experience had shown that at least one per cent of its charge sales had proved uncollectible. This testimony, general in nature and not supported by more specific evidence, is insufficient to manifest an abuse of respondent's discretion. We are without further evidence of the firm's prior experience. The respondent has *106 limited his analysis of past business experience to the four years prior to 1945 in determining a proper reserve. Although this method does not take into consideration the many years prior thereto of past experience, we are without factual knowledge of this history. Another material factor in the determination of the reasonableness of additions to the bad debt reserve is the prospect of losses in the light of then present circumstances. General business conditions had been favorable prior to 1945. The partnership's records indicate that accounts receivable diminished during the war, while charge sales increased. This trend reversed itself somewhat following the close of the war. Testimony indicates that the collection of debts became slower in 1946 but there is no evidence of a substantial change in market conditions in 1945. The partnership maintained running accounts with a number of its customers. During 1945 and 1946 the firm made charge sales which were not paid during those years. We have no evidence, however, that in 1946 these accounts were considered bad debts, nor do we have evidence that the 1945 and 1946 accounts were not eventually paid. With regard to the running *107 account maintained with Albren, Inc., the evidence points to the fact that the partnership, during the years in question, continued to extend credit to the remaining store in order to promote sales. In this manner, the partnership, which had acquired all the stock of this debtor, hoped to recover as much of the debt as possible. The evidence indicates that in 1945 and 1946 the partnership did not consider this account a bad debt. Later, in 1948 and 1949, a total loss of more than $25,000 was charged off on debts owing from Albren, Inc. When liquidated, however, the partnership, as stockholder of Albren, Inc., was relieved of a year's rental obligation of approximately $7,500. It also received a note for $10,000 which is, as yet, unpaid. The evidence presented does not disclose whether the debts incurred in 1945 and 1946 were paid or were considered bad debts then or later. We are of the opinion that the petitioners have not sustained their burden of demonstrating an abuse of respondent's discretion in his determination, nor have they succeeded in proving his action was arbitrary. The second issue relates to the advances made by petitioner Mendel Levitz to his brother in 1944 and *108 1945. The evidence discloses that the advances were made as loans for which Mendel Levitz reasonably expected to be repaid. Although neither a note nor other evidence of obligation was given, the evidence presented discloses that a debtor-creditor relationship was created. The petitioner's expectation of repayment is not made unreasonable by the fact that the debtor later died insolvent in 1946. We have no indication that at the time of the loan petitioner had cause to believe his brother could not repay the $591 advances. The respondent relies solely upon the blood relationship and lack of tangible evidence to rebut the evidence presented by petitioner on the subject. Although intrafamily transactions are subject to rigid scrutiny, , affirmed, , mere suspicion does not outweigh evidence. The petitioner has sustained his burden by showing an intention and agreement of a loan by declarations contemporaneous with the transaction. . Nothing of record indicates a gift rather than a loan. We conclude that respondent's determination on this issue is erroneous and that *109 a nonbusiness bad debt existed in 1946. [2]
The third question presented is whether Mendel Levitz is entitled to deduct a loss on the sale of the real property in Albany, New York. The premises were owned by the Sudofsky family prior to 1931. The property was subject to three mortgages of which petitioner Mendel Levitz held the third. On July 1, 1931, petitioner acquired the second mortgage by assignment at a cost of $5,000. On July 24, of the same year, petitioner's wife, Lottie Levitz, was deeded *110 the property by the Sudofskys. In the same year Mendel Levitz paid $3,172.87 in interest, taxes and legal fees in connection with the property. Petitioner became the guarantor of a bond dated March 25, 1932, on the first mortgage held by the Albany Savings Bank. In the same year the Sudofskys were discharged from their obligation under the third mortgage by means of a release. Lottie Levitz died intestate on March 9, 1937. The market value of the property on this date was $12,000. In 1943 petitioner Mendel Levitz was assigned the first mortgage by the bank for the sum of $15,750. The property was sold in 1946 by petitioner and the three children for $16,385. It is petitioner Mendel Levitz' contention that he became the owner of the property following the deed to his wife. He argues that his wife received the deed to prevent the legal and equitable title from merging in him, and that she merely held the property as his nominee. Prior to the deed to Lottie Levitz, the petitioner had purchased the second mortgage and during 1931 he paid $3,172.87 to protect his equitable interest. When the property was conveyed to his wife, the petitioner held the second and third mortgages subservient *111 to the bank's primary equitable interest. When his wife died, the property was still subject to the first mortgage and petitioner had become the guarantor of a bond on this mortgage. The first mortgage was assigned to petitioner in 1943 for an amount greater than the value of the property at the date of his wife's death. More consonant with the facts is the conclusion that petitioner allowed his wife to receive legal title from his debtor as a gift. Petitioner's daughters so testified. Petitioner has presented no evidence that his wife took the property as his nominee rather than in her own right. When she died intestate the property would descend, under New York Decedent Estate Law, Section 83, [3] one-third to petitioner and two-thirds to the three children. The deed of sale in 1946 was executed by these four parties. The petitioner, at no time sought to claim full ownership of the property. He did not attempt to prevent the vesting of legal title in his children upon his wife's death. The children did not disclaim their interest until the property was sold at a loss. The expenditure of funds by petitioner to purchase mortgages and clear the title can only be interpreted as an endeavor *112 to give his wife and her heirs unencumbered interests in the property to the extent he was able to do so. The petitioner's children received nothing upon the sale of the property. It is our conclusion that petitioner's wife, Lottie Levitz, owned the property at her death. The basis for determining gain or loss upon the subsequent sale in 1946 is the fair market value at her death, or $12,000. [4] Petitioner Mendel Levitz inherited a one-third interest, and his gain or loss is to be determined upon that basis. *113 Decisions will be entered under Rule 50. Footnotes
*. Proceedings of the following petitioners are consolidated herewith: Emanuel H. Bocian, Docket No. 33804; and Estate of Charles D. Levitz, Deceased, Esther F. Levitz, Administratrix, Docket No. 33805.↩
*. Proceedings of the following petitioners are consolidated herewith: Emanuel H. Bocian, Docket No. 33804; and Estate of Charles D. Levitz, Deceased, Esther F. Levitz, Administratrix, Docket No. 33805.↩
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(k) Bad Debts. - (1) General Rule. - Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; * * *↩
2. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(k) Bad Debts. - * * *
(4) Non-Business Debts. - In the case of a taxpayer, other than a corporation, if a non-business debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. The term "non-business debt" means a debt other than a debt evidenced by a security as defined in paragraph (3) and other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. * * *↩
3. NEW YORK DECEDENT ESTATE LAW. Sec. 83. Descent and distribution of estate of decedent. The real property of a deceased person, male or female, not devised, shall descend, and the surplus of his or her personal property, after payment of debts and legacies, and if not bequeathed. shall be distributed to the surviving spouse, children, or next of kin or other persons, in manner following: 1. One-third part to the surviving spouse, and the residue in equal portions to the children. and such persons as legally represent the children if any of them have died before the deceased. * * *↩
4. SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS. (a) Basis (Unadjusted) of Property. - The basis of property shall be the cost of such property; except that - * * *
(5) Property transmitted at death. - If the property was acquired by bequest, devise, or inheritance, or by the decedent's estate from the decedent, the basis shall be the fair market value of such property at the time of such acquisition. * * *↩